IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| MEGAN M. PEDELOSE, | ) | CASE NO. 3:25-cv-00773-JJH |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| FRANK BISIGNANO, | ) | |
| Commissioner of Social Security | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Megan M. Pedelose ("Pedelose"), seeks judicial review of the final decision of

the Commissioner of Social Security, denying her application for disability insurance benefits

("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI")

under Title XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C.

§§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

Pedelose raises four issues on review of the Administrative Law Judge's ("ALJ")

decision, arguing that:

1.      The ALJ erred when he failed to properly apply the criteria of Social
Security Ruling 96-8p and consider all of Plaintiff's impairments and
related limitations when forming the Residual Functional Capacity
("RFC").

2.      The ALJ erred when he failed to support and/or address consistency with
his conclusions regarding the opinion of the treating source.

3.      The ALJ's finding that Plaintiff did not require the use of a scooter or
wheelchair was not supported by substantial evidence and was contrary to
Social Security Ruling 96-9p, and

4.      The ALJ erroneously failed to comply with Social Security Ruling 16-3p
when evaluating the totality of Plaintiff's symptoms.

1

(ECF Doc. 8, p. 1). Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Pedelose's application for DIB and SSI be affirmed.

## II.      Procedural History

Pedelose filed for DIB and SSI on February 21, 2021, alleging a disability onset date of February 11, 2021. (Tr. 377-79). The claims were denied initially and on reconsideration. (Tr. 122, 143-44, 155). Pedelose then requested a hearing before an ALJ. (Tr. 234-35). Pedelose, represented by counsel, and a Vocational Expert ("VE") testified before an ALJ on August 23, 2022. (Tr. 77-121). On September 7, 2022, the ALJ issued a written decision finding Pedelose not disabled. (Tr. 166-90). The Appeals Council remanded the case on September 25, 2023, ordering the ALJ to obtain additional evidence concerning Pedelose's impairments, further evalauate her mental impairment in accordance with the special technique described in 20 C.F.R. §§ 404.1520a and 416.920a(c), and further evaluate whether fibromyalgia is a medically determinable impairment in accordance with Social Security Ruling 12-2p. (Tr. 195-99).

Accordingly, a second hearing was held before an ALJ on March 26, 2024, where Pedelose and a different VE testified. (Tr. 51-76). The ALJ then issued a written decision on May 2, 2024, again finding Pedelose not disabled. (Tr. 1-14). Pedelose timely filed this action on April 17, 2025. (ECF Doc. 1).

## III.     Evidence

### A.      Personal, Educational, and Vocational Evidence

Pedelose was born July 15, 1988. (Tr. 377). She was 32 years old on her alleged onset date of February 11, 2021, making her a younger individual according to agency regulations. (Tr. 42). Her date last insured ("DLI") is September 30, 2025. (Tr. 19). She has at least a high school

education. (Tr. 42). She has past relevant work in a composite job comprised of management trainee, DOT 189.167-016, SVP 6, light exertional level; stock clerk, DOT 299.367-014, SVP 4, heavy exertional level; and cashier checker, DOT 211.462-014, SVP 3, light exertional level. (Tr. 41-42). She also has past relevant work as a assembler, unit, DOT 809.681-010, SVP 4, medium exertional level as generally performed and very heavy as actually performed, and as a waitress, DOT 311.472-030, SVP 4, light exertional level as generally and actually performed. (Tr. 42).

### B.    Relevant Medical Evidence[1]

On February 9, 2021, Pedelose presented at 16 weeks pregnant to the St. Vincent Emergency Department with concern for severe vaginal bleeding. (Tr. 534). A chest x-ray was performed showing the cardiomediastinal silhouette as enlarged, similar to a prior examination, with diffuse interstitial prominence with bibasilar opacity. (Tr. 538). This cardiomegaly with interstitial prominence and bibasilar opacities was concerning for edema. (*Id.*). Pedelose also underwent am EKG that gave rise to a clinical impression of supraventricular tachycardia ("SVT"). (*Id.*). She was assessed with SVT, severe hypertensive urgency, chronic kidney disease, diastolic dysfunction/moderate tricuspid and mitral regurgitation, history of left upper extremity deep vein thrombosis ("DVT"), asthma, suspected obstructive sleep apnea, bipolar disorder, and anxiety. (Tr. 553-54).

On February 10, 2021, Pedelose underwent a Transthoracic Echocardiogram ("Echo"). (Tr. 608-14). The Echo showed moderately dilated left ventricle with moderate-severe reduced

---

[1] Pedelose's allegations solely relate to her physical impairments. The report and recommendation shall therefore be similarly limited. She did not raise any arguments related to her mental impairments, and, accordingly, any such is argument is forfeited. *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("Arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived.").

function and a left ventricle ejection fraction ("LVEF") estimated at 30-35%; mostly global hypokinesis, worse in the anterolateral and anteroseptal walls; evidence of diastolic dysfunction; moderate left ventricular hypertrophy; moderately dilated left atrium and mildly dilated right atrium; mild mitral and moderate tricuspid regurgitation; suggestion of mild pulmonary hypertension; and mild pulmonic regurgitation. (Tr. 610-11). On February 18, 2021, Pedelose was assessed by James. D. Diethelm, M.D., with essential hypertension and acute chronic combined systolic and diastolic chronic heart failure ("CHF").

On February 22, 2021, Pedelose presented to the CHF Clinic at Mercy St. Vincent Medical Center complaining of shortness of breath, better since starting on Bumex 1 mg daily, fatigue, edema, palpitations she only notices when anxious, orthopnea, and obstructive sleep apnea. (Tr. 715). She was assessed with chronic combined systolic and diastolic CHF, hyperintensive urgency, obstructive sleep apnea, cardiomegaly, uncomplicated asthma and unspecified stage chronic kidney disease. (Tr. 718). She was advised immediately to go to the emergency department due to the hyperintesive urgency reflected by her blood pressure of 200/120. (*Id.*).

An Echo performed on March 2, 2021 again showed an estimated LVEF of 30-35%, with moderate LV systolic dysfunction, global hypokinesis and trivial pericardial effusion. (Tr. 815). Pedelose attended a checkup with Dr. Diethelm on May 14, 2021, and was assessed with obesity, obstructive sleep apnea syndrome, essential hypertension, fibromyalgia and other cardiomyopathy. (Tr. 753). An Echo on December 20, 2021 showed left ventricle systolic function as normal, with an estimated LVEF of 55-60%, normal wall motion and no regional wall motion abnormalities. (Tr. 789).

At an April 18, 2022 office visit Pedelose reported that her legs swell two hours after she gets up despite taking Lasix and Bumex. (Tr. 811). She reported checking her blood pressure daily, and that it generally is around 130/88. (*Id.*). Pedelose again reported leg swelling at a May 17, 2022 office visit, but she chose to continue on her blood pressure medication, nifedipine despite her doctor's belief it was contributing to the swelling. (Tr. 813).

On July 12, 2022, Pedelose met with a new physician, Ashok R. Salvi, M.D., and reported she was seeking to "go on disability" primarily due to low back pain. (Tr. 824). She reported minimal relief from chiropractic treatment and pain medications. (*Id.*). Examination revealed "multiple tender points and myofascial trigger points" and "tenderness over the facet blocks both in cervical as well as lumbar region." (*Id.*). Her gait was noted as antalgic, and she was using a cane for support while walking. (*Id.*). Pedelose was assessed with lower back pain and lumbar spondylosis, and on August 8, 2022 she underwent a right lumbar medial branch block at L3, L4, and L5. (Tr. 820). She had a left lumbar medial branch block on August 16, 2022, also at L3, L4, and L5. (Tr. 887). She had a right sided radiofrequency ablation on September 28, 2022 (Tr. 1004), and a left sided radiofrequency ablation on October 26, 2022. (Tr. 1002). A lumbar MRI performed on October 27, 2022 was found to be normal. (Tr. 994).

Pedelose presented at the emergency department on January 23, 2023 with abdominal pain, nausea, and vomiting. (Tr. 1164). An abdominal CT scan showed findings suspicious for a partial small bowel obstruction. (Tr. 1169). She missed an occupational therapy appointment on January 24, 2023, with notes reading, "Pt. reports independence in self care tasks/mobility and transfers. No skilled OT needed at this time." (Tr. 1188). Pedelose underwent another Echo on January 24, 2023 as well, that revealed normal left and right ventricle size and function,

estimated LVEF of greater than 55%, no segmental wall abnormalities seen, mild to moderate left ventricular hypertrophy and mild mitral and tricuspid regurgitation. (Tr. 1092).

At a May 8, 2023 office visit, Pedelose reported she was unable to walk more than 30 feet at a time, and was in need of a scooter for mobility. (Tr. 956). She reported pain in both knees and her back with minimal exertion, and tingling in her bilateral hips that radiated to her feet. (*Id.*). She was assessed with lumbar spondylosis without myelopathy or radiculopathy, osteoarthritis of bilateral patellofemoral joints, chronic combined systolic and diastolic CHF, chronic kidney disease, stage 3a, morbid obesity, and fibromyalgia. (*Id.*). She reported difficulty with ambulation again on July 14, 2023, requiring a cane or walker, and indicated a need for a wheelchair. (Tr. 950).

### C. Medical Opinion Evidence

#### 1. State Agency Reviewing Opinion Evidence

On December 23, 2021, state agency reviewing physician Gary Hinzman, M.D., opined that Pedelose was capable of performing work at the light exertional level except that she could only occasionally climb ramps or stairs, and never climb ladders, ropes or scaffolds; she could frequently balance or stoop, but only occasionally kneel, crouch or crawl; she would need to avoid concentrated exposure to extreme heat or extreme cold, humidity, dusts, odors, fumes, gases, or poor ventilation; and she must avoid even moderate exposure to unprotected heights, moving mechanical parts or heavy machinery. (Tr. 128-30). State agency reviewing physician Abraham Mikalov, M.D., affirmed Dr. Hinzman's opinion on February 27, 2022. (Tr. 149-51).

#### 2. Consultative Examiner Opinion Evidence

Ryan Lakin, M.D., conducted a consultative examination of Pedelose on September 20, 2021. (Tr. 777-84). Pedelose reported having back and knee pain since a fall in 2022, and noted a

6

history of hypertension, DVT, mitral valve prolapse, CHF, asthma, and shortness of breath on exertion. (Tr. 777). She indicated difficulty with difficulty performing activities of daily living including cooking, shopping, and cleaning. (*Id.*). She reported that she does not drive, and is incapable of standing for longer than five to ten minutes, walking through a mall without frequent breaks, siting through an entire movie, or climbing 20 stairs. (*Id.*). She was not utilizing an ambulatory assistive device, although the range of motion in her right knee was limited. (Tr. 778). Dr. Lakin diagnosed chronic lower back and right knee pain, CHF, asthma, obstructive sleep apnea, gastroesophageal reflux disease, hypertension, obesity, and psychiatric illness. (Tr. 779). Dr. Lakin opined that Pendelose was capable of lifting/carrying 5-10 pounds frequently and 10-20 pounds occasionally; she was capable of sitting continuously, with breaks, and standing/walking occasionally, with breaks; her activities of daily living would be moderately affected, travelling long distances would be difficult, and her communication is normal. (*Id.*).

### 3. **Treating Source Opinion Evidence**

Dr. Diethelm submitted a medical source statement on July 1, 2022. (Tr. 818-19). He diagnosed Pedelose with hypertension, mitral regurgitation, and pedal edema, and noted symptoms including weakness, peripheral edema, and palpitations. (Tr. 818). Dr. Diethelm opined that Pedelose was capable of working 4 hours per day, that she could sit for 4 hours per workday and stand/walk 2 hours, that she could lift consistent with sedentary exertion, and that she would be off-task more than 25% of the workday. (Tr. 819).

### D. **Administrative Hearing Evidence**

Pedelose first testified before an ALJ on August 23, 2022. (Tr. 77-121). She testified that she was 34 years old, and resided with her new husband and her daughter. (Tr. 84-86). She is a high school graduate who attended some college. (Tr. 87). She last worked in February 2021, but

left that job after suffering a heart attack. (*Id.*). Pedelose appeared at the hearing with her right hand bandaged and attributed the injury to a fall that happened because of problems she has with her knees. (Tr. 93-94).

Pedelose testified that she was hospitalized for about five days following her heart attack in February 2021, but has managed to control her condtion with medication. (Tr. 94-95). She does, however, have a lot of swelling in her legs related to her heart condition. (Tr. 95). On a good day she is able to walk a mile, stand for 10 to 15 minutes and sit for up to an hour. (*Id.*). She is capable of lifting no more than a gallon of milk. (Tr. 96). She has good days once or twice weekly. (*Id.*). She also suffers from anxiety and depression and has been on medication to control those conditions for about ten years. (*Id.*). She is also prescribed tramadol, which she takes four times daily, for her fibromyalgia. (Tr. 98).

During her typical day, Pedelose will do some housework in 10 to 15 minute increments, and she is able to prepare simple foods. (Tr. 99-100). She requires her husband's assistance to shower. (Tr. 100). She has five dogs, but they mostly stay outside during the day and do not require walks. (Tr. 101).

Under questioning from her attorney, Pedelose testified that she tried to return to work after her heart attack, but found that even when she sat to work her legs would swell and she would have complications with her blood pressure. (Tr. 102-03). She typically has to elevate her legs to heart level three to four times daily, for an hour at a time, and she is on the maximum allowable dose of Lasix. (Tr. 103). Due to the pain and swelling in her legs, she will have falls. (Tr. 104). She has also recently been diagnosed with scoliosis and has been taking injections in her back. (*Id.*). Pedelose testified that she uses a cane for walking about three to four days per

8

week. (Tr. 107). About two to three times per week the swelling in her legs gets so bad that she will have to lie down . (Tr. 111). She takes a 20 to 60 minute nap every day. (Tr. 112).

Once Pedelose completed her testimony, VE Zachary Matthews testified. (Tr. 113-20). VE Matthews testified that Pedelose had prior work in a composite job that included three separate positions including management trainee, DOT 189.167-018, SVP 6, light exertional level; stock clerk, DOT 299.367-014, SVP 4, heavy exertional level; and cashier-checker, DOT 211.462-014, SVP 3, light exertional level. (Tr. 114-15). Pedelose also worked in a second composite job comprised of accounting clerk, DOT 215.482-010. SVP 5, sedentary exertional level but actually performed at medium, and general clerk, DOT 209.562-010, SVP 3, light exertional level but actually performed at medium. (Tr. 115). Pedelose has also worked as an assembler, unit, DOT 809.681-010, SVP 4, medium exertional level but perfomed at very heavy, and as a waitress, DOT 311.477-030, SVP 3, light exertional level. (Tr. 116).

For her first hypothetical, the ALJ asked the VE to consider an individual of the same age, education, and work experience as Pedelose who is capable of performing work at the sedentary exertional level with occasional climbing of ramps and stairs, but no climbing of ladders, ropes or scaffolds; frequent balancing and stooping but only occasional kneeling, crouching or crawling; no exposure to concentrated levels of extreme cold, extreme heat, extreme humidity, fumes, odors, dust, gases, poor ventilation, or other pulmonary irritants; no exposure to hazards such as moving machinery, unprotected heights, or commercial driving; able to perform simple, routine and repetitive tasks, but not at a production rate pace, such as assembly line or conveyor belt work; able to tolerate few changes in a routine work settings, defined as routine job duties that remain static and are performed in a stable work environment, and any new changes must occur infrequently and be gradually introduced and easily explained.

9

(Tr. 116-17). The VE opined that this individual would be incapable of performing Pedelose's past work, but could perform sedentary, unskilled work including as an office clerk, DOT 249.587-018, with 30,000 jobs in the national economy; a sorter, DOT 521.687-086, with 11,000 jobs in the national economy; and as an order clerk, DOT 209.567-014, with 16,000 jobs in the national economy. (Tr. 117).

For her second hypothetical the ALJ asked the VE to consider all of the same limitations of the first hypothetical, but with the additional limitation that the individual would require the ability to elevate their legs for five minutes of every hour in the immediate vicinity of the workstation. (*Id.*). The VE opined that if the elevation was below knee level then the individual would be able to perform the same jobs cited for the first hypothetical, but if the elevation was to waist level or above this limitation would be work preclusive. (Tr. 118).

For her third hypothetical, the ALJ asked the VE to consider again the circumstances of the second hypothetical, including leg elevation that is not work preclusive, but with the additional limitation that the individual would require the use of a single prong cane for ambulation. (*Id.*). The VE opined that this individual could perform the same jobs, and at the same numbers, as in the first hypothetical. (*Id.*). For a fourth and final hypothetical, the VE added the limitation that the individual would be off-task 25% or more of the workday. (Tr. 118-19). The VE opined that this limitation is work preclusive. (Tr. 119). Finally, the VE testified that being off task beyond 10% of the work day, or exceeding 12 absences in a calendar year would be work preclusive. (*Id.*).

Pedelose testified a second time, before a different ALJ, on March 26, 2024. (Tr. 51-76). Pedelose testified that she was now using a wheelchair everyday, and she also has a scooter she will use when she leaves home if it is able to be transported. (Tr. 55). She uses these devices

because she is incapable of walking further than 30 feet without becoming short of breath, falling, or losing her balance due to back pain and fibromyalgia. (Tr. 56). She will use a cane or walker to walk within her house or to do a short trip to the store. (*Id.*). Pedelose testified that her feet swell every day if she is on them for even a limited time, or if she sits continuously. (Tr. 57). She will keep her feet elevated at hip or heart level for hours at a time to reduce the swelling. (*Id.*). She is incapable of performing household chores such as laundry or washing dishes without back pain and swelling in her feet. (Tr. 57-58). Further, her heart will race uncontrollably two or three times weekly causing her to feel nauseous, vomit, and become very hot and dizzy. (Tr. 59). She attributes pain in her shoulder, back, lower back, hips, and spine to fibromyalgia. (Tr. 60). Pain in her neck causes her to experience headaches as well. (*Id.*).

VE Sherry Browning also testified at the second hearing. (Tr. 71-75). The ALJ adopted all of the past relevant work determined at the first hearing, except that he found the composite job comprised of accounting clerk and general clerk did not qualify and was removed. (Tr. 71). For his first hypothetical he asked the VE to assume an individual of Pedelose's age, education, and work experience with the residual functional capacity to perform sedentary work, but limited to no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps or stairs; frequent balancing or stooping, but no kneeling, crouching or crawling; occasional use of bilateral lower extremities for operation of foot controls; requiring a cane for ambulation; needs to elevate legs bilaterally six inches for five minutes out of every hour in the immediate vicinity of the workstation; needs to avoid all exposure to moving mechanical parts, commercial driving and high exposed places; needs to avoid more than occasional concentrated exposure to irritants such as fumes, odors, dust, gases, extreme cold, extreme heat, humidity, and wetness; can understand, remember and carry out gradually introduced, easily explained, simple instructions for work not

requiring a specific production rate, such as assembly line work, and not requiring hourly quotas; and is capable of using judgment to make simple work-related decisions with occasional changes in a routine work setting. (Tr. 72). The VE opined that such an individual would be incapable of performing Pedelose's past work, but could perform unskilled, sedentary jobs such as an assembler, DOT 706.684-030, with approximately 22,000 jobs in the national economy; a sorter, DOT 521.687-086, with approximately 9,000 jobs in the national economy; and an inspector, DOT 669.687-014, with approximately 10,000 jobs in the national economy. (Tr. 73).

For a second hypothetical, the ALJ asked the VE to consider the same circumstances of the first hypothetical but with the additional limitation of a sit/stand option under which the individual is able to alternate positions for 1 or 2 minutes, no more frequently than every 30 minutes in the immediate vicinity of the workstation, and while remaining on task for at least 90% of the work period. (*Id.*). The VE opined that this individual could perform the same jobs noted in the first hypothetical. (*Id.*). For a third hypothetical, the ALJ added the additional limitations that the individual would require use of a walker, wheelchair, or electric scooter for ambulation, and would need to frequently elevate their bilateral legs to waist level. (Tr. 74). The VE opined those limitations would eliminate competitive employment. (*Id.*). Finally, the VE testified that employers will tolerate no more than 10% of time off-task and no more than half a day absent per month. (*Id.*).

## IV.     The ALJ's Decision

In his decision dated May 2, 2024, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2025.

2.    The claimant has not engaged in substantial gainful activity since February 11, 2021, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: bilateral lower extremity edema/pedal, peripheral edema; chronic combined systolic and diastolic congestive heart failure (CHF)/tricuspid regurgitation/ cardiomyopathy; mild degenerative joint disease of the right knee with osteophyte formation; asthma with bronchitis; hypertensive urgency; cardiomegaly; morbid obesity; generalized anxiety disorder/panic disorder; attention deficit hyperactivity disorder (ADHD); and depressive disorder (20 C.F.R 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967 (a) except able to sit or stand alternating positions for two minutes in the immediate vicinity of the workstation, no more frequently than every 30 minutes, while remaining on task 90 percent of the work period. Postural limitations of no climbing of ladders, ropes or scaffolds. Occasional climbing of ramps and stairs. Frequent balancing and stooping. Occasional kneeling, crouching and crawling. Occasional use of bilateral lower extremities for operation of foot controls. Uses a cane for ambulation. Elevates bilateral legs six inches high, for 5 minutes of each work hour, in the immediate vicinity of the workstation. Environmental limitations to avoid all exposure to moving mechanical parts, commercial driving, and high exposed places. Additonal environmental limitations to avoid more than occasional, concentrated exposure to irritants such as fumes, odors, dust, gases, extreme cold, extreme heat, humidity, and wetness. Can understand, remember and carry out gradually introduced, easily explained simple instructions, for work not requiring a specific production rate, such as assembly line work, nor work requiring hourly quotas. Capable of using judgment to make simple work-related decisions, with occasional changes in a routine work setting.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on July 15, 1988 and was 32 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969 and 416.969a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from February 11, 2021 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 19-43).

## V.      Law and Analysis

### A.      Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1.      whether the claimant is engaged in substantial gainful activity;

2.      if not, whether the claimant has a severe impairment or combination of impairments;

3.      if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.      if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.      if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v)[2]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B. Standard of Review

This Court reviews the Commissioner's final decision to determine whether it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*, quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

---

[2] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.* Generally, these regulations are duplicates and establish the same analytical framework. For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

## VI.     Discussion

Pedelose raises four issues for this Court's review, arguing that:

1.    The ALJ erred when he failed to properly apply the criteria of Social Security Ruling 96-8p and consider all of Plaintiff's impairments and related limitations when forming the RFC;

2.    The ALJ erred when he failed to support and/or address consistency with his conclusions regarding the opinion of the treating source;

3.    The ALJ's finding that Plaintiff did not require the use of a scooter or wheelchair was not supported by substantial evidence and was contrary to Social Security Ruling 96-9p; and,

4.    The ALJ erroneously failed to comply with Social Security Ruling 16-3p when evaluating the totality of Plainitiff's symptoms.

(ECF Doc. 8, p. 1).

A.       **The ALJ properly evaluated Pedelose's fibromyalgia when forming the RFC.**

When considering Pedelose's impairments, the ALJ determined her fibromyalgia to be non-severe as she showed the requisite signs of fibromyalgia, but her symptoms did not cause more than a minimal limitation on the claimant's ability to perform work-related activities since treatment records signal her symptoms were controlled with medication management. (Tr. 20-21). Pedelose argues this assessment was inconsistent with the requirements of Social Security Ruling 12-2p, which demands that the ALJ look at widespread pain and other symptoms, such as fatigue when considering fibromyalgia. (ECF Doc. 8, p. 9). Further the ALJ should consider a longitudinal record concerning fibromyalgia whenever possible, as symptoms of fibromyalgia often wax and wane. (*Id.*). In Pedelose's view, the ALJ failed to discuss the effects fibromyalgia symptoms may have had on her ability "to engage in substantial gainful activity on a full-time and sustained basis." (*Id.* at p. 9). This failure, Pedelose contends, is inconsistent with the mandate of Social Security Ruling 96-8p requiring the ALJ to consider the limitations and restrictions imposed by all of her severe and non-severe impairments. (*Id.* at p. 11). Accordingly, Pedelose believes the case should be remanded for further review because there is no accurate and logical bridge between the record and the ALJ's finding that Pedelose is not disabled. (*Id.*).

The Commissioner responds that the ALJ's finding that fibromyalgia was not severe was supported by the ALJ's determination that symptoms were controlled with medication management. (ECF Doc. 10, p. 5). Further, the Commissioner asserts that the determination of whether fibromyalgia was or was not severe is ultimately irrelevant, because the ALJ found other impairments severe and continued the sequential evaluation. (*Id.*). When crafting the RFC, the ALJ considered all impairments, including those deemed non-severe, explicitly discussing fibromyalgia throughout the decision. (*Id.* at pp. 5-6). Because the ALJ considered all of

17

Pedelose's severe and non-severe impairments in formulating the RFC, substantial evidence supports his decision. (*Id.* at p. 6).

The ALJ considers the severity of a claimant's impairments at Step Two of the sequential evaluation. 20 C.F.R. §404.1520(a)(4)(ii). An impairment is not considered severe if it does not "significantly limit [one's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1522(a). The claimant bears the burden of demonstrating that he suffers from a medically determinable impairment. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). The Sixth Circuit has construed Step Two as a *de minimis* hurdle intended to "screen out totally groundless claims." *Kestel v. Comm'r of Soc. Sec.,* 756 F. App'x. 593, 597 (6th Cir. 2018). Where an ALJ determines that one (or more) of a claimant's impairments is severe, the ALJ then proceeds to consider the "limitation and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" *Fisk v. Astrue*, 253 F. App'x 580, 583 (6th Cir. 2007). Thus, because an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, any perceived failure to "find additional severe impairments at step two '[does] not constitute reversible error.'" *Id.*, quoting *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

Here, the ALJ provided a thorough analysis of Pedelose's fibromyalgia. The ALJ expressly referenced Social Security Ruling 12-2p, which provides guidance for how an ALJ is to determine whether fibromyalgia is a medically determinable impairment. (Tr. 21). The ALJ applied the criteria described in Social Security Ruling 12-2p and determined that fibromyalgia was a medically determinable impairment, but further found it does not cause "more than a minimal limitation on the claimant's ability to perform work-related activities since treatment records signal her symptoms were controlled with medication management." (*Id.*). Nevertheless,

the ALJ considered all of Pedelose's "medically determinable impairments, including those that are not severe when assessing the claimant's residual functional capacity." (*Id.*).

In his rather extensive consideration of the medical record, the ALJ made several references to Pedelose's fibromyalgia diagnosis and the associated symptoms of pain and fatigue. (Tr. 25, 27, 30-33). The ALJ specifically noted examination records from July 2022 that documented Pedelose had "multiple tender points and myofascial trigger points, positive facet loading to the lumbar region bilaterally, tenderness over the facet blocks both in the cervical and lumbar region, an antalgic gait and she was using the support of a cane when walking." (Tr. 31). The ALJ noted similar findings in pain management examination notes. (Tr. 32). It is clear that, despite a finding that fibromyalgia was non-severe, the ALJ appropriately considered that diagnosis and the accompanying symptoms when determining the RFC. As there is an accurate and logical bridge established between the medical record and the RFC, the decision should not be overturned on this basis.

> **B.    The ALJ properly evaluated Dr. Diethelm's opinion, addressing both its supportability and its consistency with the record.**

Pedelose next argues that the ALJ failed to properly assess the opinion of her physician, Dr. Diethelm. (ECF Doc. 8, at pp. 12-14). Dr. Diethelm opined that Pedelose was capable of working 4 hours per day, that she could sit for 4 hours per workday and stand/walk 2 hours, that she could lift consistent with sedentary exertion, and that she would be off-task more than 25% of the workday. (Tr. 819). Pedelose asserts that the ALJ misstated Dr. Diethelm's examination notes, and the ALJ's determination that Dr. Diethelm's opinion carried limited persuasiveness was not supported by the record. (*Id.* at p. 13). Pedelose argues that the ALJ "relied on his erroneous conclusion and failed to review the medical evidence which supported thse opinions

from [Dr. Diethelm]." (*Id.* at p. 14). This, in Pedelose's view, was harmful error, necessitating remand. (*Id.*).

The Commissioner responds that substantial evidence supports the ALJ's evaluation of Dr. Diethelm's opinion. (ECF Doc. 10, at pp. 6-8). The Commissioner argues that the ALJ addressed the supportability of Dr. Diethelm's opinion by noting several instances in his examinations of Pedelose where she denied significant symptoms, and where the findings of the examinations were benign. (*Id.* at p. 6). Such benign findings did not support the more significant limitations suggested in Dr. Diethelm's opinion. (*Id.* at p. 7). The Commissioner further asserts that the ALJ noted the inconsistency of Dr. Diethelm's opinion with the the other evidence in the file, specifically noting discrepancies when compared to cardiology records. (*Id.*). As the ALJ addressed both supportability and consistency in his evaluation of Dr. Diethelm's opinion, the Commissioner argues, substantial evidence supports the ALJ's determination that the opinion was of limited persuasive value. (*Id.*).

The Commissioner has the better of this argument. An RFC determination is a legal finding, not a medical determination; it is thus for an ALJ – not a physician – to determine a claimant's RFC. *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 (6th Cir. 2009) ("Although physicians opine on a claimant's residual functional capacity to work, [the] ultimate responsibility for capacity-to-work determinations belongs to the Commissioner."); *see also* 20 C.F.R. 404.1546(c) ("[T]he administrative law judge . . . is responsible for assessing your residual functional capacity."). Even if an ALJ finds an opinion wholly persuasive, "an ALJ is not necessarily required to adopt wholesale limitations contained therein." *Harris v. Comm'r of Soc. Sec.*, No. 1:13-cv-00260, 2014 WL 346287, *11 (N.D. Ohio Jan. 30, 2014).

An ALJ is no longer obligated to give "good reasons" for not adopting a consultant's opinion as written. *Cf.* 20 C.F.R. § 404.1527(c)(2). Instead, the ALJ's only articulation duty is to describe "how [he] considered the medical opinions" and "how persuasive [he] find(s) all of the medical opinions." 20 C.F.R § 416.920c, *see also Gamble v. Berryhill*, No. 5:16-CV-2869, 2018 WL 1080916, *5 (N.D Ohio Feb. 28, 2018). Factors to be considered include: (1) Supportability; (2) Consistency; (3) Relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) Specialization; and (5) other factors. 20 C.F.R. § 416.920c. Supportability and consistency are considered the two "most important" factors; therefore, the regulations dictate that the ALJ "will explain" how the supportability and consistency factors were considered. 20 C.F.R. § 416.920c.

In assessing the supportability of Dr. Diethelm's opinion, the ALJ wrote:

> Dr. Diethelm's treatment records consistently reflected the claimant denied having any fatigue, fever, ear pain, chest pain, palpitations, chest tightness and/or heavy, pressure, shortness of breath, wheezing, cough, abdominal pain, nausea, vomiting, dizziness headache, weakness or excessive sweating at primary care visits…[W]hile the claimant also was consistently found to be morbidly obese by Dr. Diethelm during primary care visits, he blood pressure was only elevated intermittently and the edema in the extremities sporadic at the same appointments. [T]he objective examinations were otherwise consistently benign with the claimant appearing alert and oriented to time, place and person with full range of motion in her neck, her thyroid normal, respiration rhythm and depth normal, lungs clear to auscultation, her heart rate and rhythm regular, her abdomen non-tender, bowel sounds normal and sensation intact at primary care appointments . . . [A]s such, Dr. Diethelm's own treatment records do not support the limitation sitting, off-time and part-time work of only four hours contemplated by the doctor.

(Tr. 32). This was clearly a thorough assessment of Dr. Diethelm's examination notes. While Pedelose cites some limited examples within the records where notes may support a differing assessment than the ALJ's, the Court declines the invitation to re-weigh the evidence.

21

The ALJ also assessed the consistency of Dr. Diethelm's opinion with the record,

writing:

> Similarly, although cardiology records revealed the claimant was morbidly obese with elevated blood pressure at visits since the alleged onset date, the claimant remained consistently alert and oriented times three with dry skin, a normal thyroid, clear lungs, normal heart sounds, her abdomen soft with no tenderness, the lower extremities rarely with edema, there was no evidence of depression or anxiety and all joint motion was normal with no weakness or limitation (Exhibits 4F/2-3, 11F/1-2 and 22F/86). Pain management records as well showed the claimant was morbidly obese with multiple tender points and myofascial trigger points in the cervical and lumbar spine, mild reduction in range of motion at the cervical and lumbar spines and tenderness over the facet blocks in both the cervical and lumbar region, but Patrick's test was negative for hip pain, peripheral pulsation was present, cranial nerves were normal, there was no clubbing, cyanosis or edema, motor strength was full in all muscle groups, sensation was grossly intact and there was no wasting or discoloration (Exhibit 13F/5-7 and 21F/10).
>
> An x-ray of the lumbar spine also merely found a slight curvature to the right in the lumbar spine with otherwise no malalignment and normal disc heights while an MRI of the lumbar spine was normal (Exhibit 13F/4 and 21F/94-95). There is no indication as well that the claimant has required any hospitalization for any of her cardiac symptoms since she was discharged on the alleged onset date in February 2021. Thus, the objective evidence throughout the record and the claimant's treatment history is not consistent with Dr. Deithelm's opinion regarding sitting, off-task and part-time work of only four hours per day either. The undersigned does not find those parts of Dr. Deithelm's opinion persuasive.
>
> Nevertheless, primary care records by Dr. Deithelm demonstrating the claimant was morbidly obese with intermittent elevated blood pressure and sporadic edema in the lower extremities does appear to support the doctor's opinion that the claimant would be limited to standing and/or walking two hours total in an eight-hour workday and she would be limited to lift and carry 10 pounds occasionally, less than 10 pounds frequently (Exhibits 2F/8, 5F/8, 10F/8, 12 and 21F/78, 83-84). Recent pain management records as well signaling the claimant was morbidly obese with multiple tender points and myofascial trigger points in the cervical and lumbar spine, mild reduction in range of motion at the cervical and lumbar spines, tenderness over the facet blocks in both the cervical and lumbar region and an antalgic gait with the support of a cane when walking is also consistent with Dr. Deithelm's opinion regarding the claimant's ability to stand and/or walk and lift and carry (Exhibits 13F/5-7 and 21F/10). The undersigned finds that those parts of Dr. Deithelm's opinion are persuasive as a result and they were onsidered in finding the claimant is limited to work at the sedentary exertional level in the residual functional capacity herein.

(Tr. 32-33). Clearly the ALJ articulated exactly how he assessed the consistency of Dr. Diethelm's opinion with the remainder of the record, and provided a logical and accurate bridge, relying on substantial evidence, to assist a subsequent reviewer in understanding how he arrived at his conclusion. Thus,the ALJ's assessment should not be disturbed on this basis.

### C.  The ALJ properly articulated his assessment of Pedelose's need for a particular assistive device.

Pedelose next argues that that the ALJ erroneously found, despite a prescription for a motorized scooter, that the scooter was not medically necessary. (ECF Doc. 8, p. 15). Pedelose contends that the ALJ made this finding on the basis of her use of a cane when attending pain management visits, but in so doing disregarded multiple notations in the record of her using a motorized scooter on a daily basis. (*Id.*). Pedelose notes that the scooter was prescribed in May 2023 to help with her mobility due to shortness of breath, and argues that this meets the requirements of Social Security Ruling 96-9p for medical documentation establishing the need for a hand-held assistive device and a description of the circumstances for which it is required. (*Id.*).

The Commissioner counters that substantial evidence supports the ALJ's determination that Pedelose required only a cane, rather than a wheelchair or motorized scooter, for ambulation. (ECF Doc. 10, p. 8). The Commissioner asserts that the medical note cited by Pedelose reads simply, "Motorized Scooter – Daily," and does not articulate the circumstances for which it is required, or establish that it is prescribed due to her shortness of breath. (*Id.*). This lack, per the Commissioner, is fatal to Pedelose's case. (*Id.*). Further, the Commissioner argues that the ALJ discussed numerous examinations in the record where there was no indication of gait abnormalities and where there are normal sensory and neurological findings, and accordingly, remand is not warranted. (*Id.* at pp. 8-9).

23

To find that a hand-held assistive device is "medically required", SSR 96-9p requires "medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed." SSR 96-9p, 1996 WL 374185 (S.S.A. July 2, 1996). The need for a hand-held assistive device is not disabling in and of itself. "[T]he point of the 'medically required' test in SSR 96-9p is to identify those situations when the set of sedentary jobs is reduced by use of a hand-held assistive device." *See Palmer v. Comm'r of Soc. Sec.*, No. 19-CV-11020, 2020 WL 5209358, at *4 (E.D. Mich. Sept. 1, 2020) citing SSR 96-9p at *7 (comparing situations where a cane would and would not erode the occupational base).

Soccial Security Ruling 96-9p contains two requirements before an ALJ may conclude that a hand-held assistive device is "medically required." First, there must be medical documentation establishing the need for said device to aid in walking/standing; and second, the medical documentation must also "describe[e] the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96-9p, *7. A claimant's contention that an assistive device is required does not satisfy SSR 96-9p's requirements without corresponding support in the medical record. *Parrish v. Berryhill*, No. 1:16-CV-1880, 2017 WL 2728394, at *11 (N.D. Ohio June 8, 2017), *report and recommendation adopted sub nom. Parrish v. Comm'r of Soc. Sec.*, 2017 WL 2720332 (N.D. Ohio June 23, 2017) (collecting cases). "An ALJ may thus find that a handheld assistive device is not medically necessary, even if a claimant regularly uses a cane, if the record evidence does not otherwise disclose the type of information SSR 96-9p requires." *Rutter v. Comm'r of Soc. Sec*., No. 3:21-CV-01883-JGC, 2022 WL 4585897, *15 (N.D. Ohio

Sept. 2, 2022), *report and recommendation adopted*, No. 3:21-CV-01883, 2022 WL 4585808

(N.D. Ohio Sept. 29, 2022).

> In addressing the need for an assistive device, the ALJ wrote:

> Finally, the residual functional capacity adds the claimant requires the use of a cane for ambulation when considering she was observed to use a cane for walking during a very recent pain management appointment in July 2022 (Exhibit 13F/5-7). Prior to that time, cardiology and CHF records reflected the claimant's musculoskeletal range of motion was normal or all joint movement was normal upon examination at appointments (Exhibits 3F/11-12, 4F/2-3, 11F/1-3 and 22F/86). The claimant was observed to have a normal gait as well during an internal medicine consultative examination in September 2021 (Exhibit 8F/3-9). Primary care records also do not indicate the claimant had any gait abnormalities while the sensory exam was intact or neurological exam normal upon examination at visits (Exhibits 2F/6-8, 5F/6-8, 10F/8-12, 13F/5-7 and 21F/1-2, 35-36, 42, 52-59, 63-64, 78-84).

> Notably, although the claimant testified to using a motorized scooter and she was prescribed the motorized scooter by her primary care provider in May 2023, primary care records did not indicate the claimant had any gait abnormalities while the sensory and/or neurological exams were intact and/or normal upon objective examination at visits throughout the relevant period even at the appointment wherein she was prescribed the scooter (Exhibits 2F/6-8, 5F/6-8, 10F/8-12 and 21F/2, 32-42, 50-52, 57-59, 63-64, 78-84). Pain management records also did not reflect the claimant used the motorized scooter at appointments, only a cane at appointments (Exhibits 13F/5-7 and 21F/10). As a result, the undersigned finds the motorized scooter was not medically necessary and the residual functional capacity does not include such use herein.

(Tr. 37). In applying the two prong test outlined in Social Security Ruling 96-9p, there was

clearly medical documentation of the need for the motorized scooter, as it was prescribed by her

physician on May 8, 2023. (Tr. 956). In reviewing the record, however, the ALJ found no

corresponding description of the circumstances for which the scooter may be needed, including

how often it may be required, and under what conditions. Rather, the ALJ described various

points in the record where Pedelose was able to function without use of the scooter, indicating

that it was not medically necessary. The ALJ's reasoning is abundantly clear in the paragraphs

above, and it is supported by substantial evidence. Accordingly, I cannot recommend remand based on this issue.

      **D.**      **The ALJ complied with Social Security Ruling 16-3p when evaluating the totality of Pedelose's subjective complaints.**

Finally, Pedelose argues that the ALJ did not follow the mandates of Social Security Ruling 16-3p when evaluating her subjective complaints. (ECF Doc. 8, pp. 16-21). Pedelose contends that the ALJ provided for his conclusion that her medically determinable impairments "could reasonably be expected to cause some of the alleged symptoms." (*Id.* at p. 18). She believes that her testimony and the medical evidence established the limited nature of her daily activities owing to her symptoms. (*Id.* at p. 19). Further, Pedelose argues, the ALJ did not properly account for her pain related symptoms and edema, and how those symptoms interfered with her ability to maintain the attention and concentration necessary to complete work on a sustained and full-time basis. (*Id.*). Pedelose concludes that the ALJ did not provide substantial evidence to support his determination that her statements were inconsistent with the medical evidence, and argues that remand is therefore required. (*Id.* at p. 20).

The Commissioner responds that substantial evidence supports the ALJ's evaluation of Pedelose's symptoms, and his determination is entitled to deference. (ECF Doc. 10, p. 9). The Commissioner notes that the ALJ considered evidence relative to the location, duration, frequency and intensity of Pedelose's symptoms, as well as precipitating and aggravating factors. (*Id.* at p. 10). He also considered the medication, treatments she received other than medication, and other measures used to relieve her symptoms. (*Id.*). The Commissioner asserts that the ALJ also considered Pedelose's activities of daily living, and ultimately set forth an extremely restrictive RFC. (*Id.*). Accordingly, the Commissioner contends, the Court should not remand on this issue, because "it is for the ALJ, not the reviewing court to judge the consistency of a

claimant's statements." (*Id.*, citing *Masterson v. Comm'r of Soc. Sec.*, No. 24-5512. 2025 WL 317501, at *2 (6th Cir. Jan. 28, 2025), quoting *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 171 (6th Cir. 2020)).

When a plaintiff alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating those symptoms. *See* 20 C.F.R. § 404.1529; SSR 16-3p, 2017 WL 5180304, *2-3 (Oct. 25, 2017). First, the ALJ must determine whether the individual has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; second the ALJ must evaluate the intensity, persistence, and functional limitations of those symptoms by the claimant, considering objective medical evidence and other information provided by medical sources, and any other relevant evidence on the record. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304.

Beyond medical evidence, SSR 16-3p sets forth seven factors that the ALJ should consider:, including: (1) daily activities; (2) the location, duration, frequency, and intensity of the pain or other symptoms; (3) precipitating and aggravating factors; (4) the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures other than treatment the individual used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions. SSR 16-3p, 2017 WL 5180304, at *7-8.

In performing this assessment, the ALJ is not required to analyze all seven factors but must still show that he considered the relevant evidence. *Roach v. Comm'r of Soc. Sec.*, No. 1:20-CV-01853-JDG, 2021 WL 4553128, at *10-11 (N.D. Ohio Oct. 5, 2021). Indeed, the ALJ's assessment of an individual's subjective complaints and limitations must be supported by

substantial evidence and be based on a consideration of the entire record. *Rogers*, 486 F.3d at 247; *see also Millsap v. Comm'r of Soc. Sec.*, No. 3:19-cv-197, 2020 WL 6275948, at *3 (S.D. Ohio May 27, 2020), *report and recommendation adopted*, No. 3:19-cv-197, 2020 WL 6273402 (S.D. Ohio Oct. 26, 2020). Nonetheless, it remains the province of the ALJ and not the reviewing court to assess the consistency of subjective complaints and the impact of a plaintiff's symptoms with the record as a whole. *Rogers*, 486 F.3d 247 (internal quotations omitted). Therefore, "absent a compelling reason," an ALJ's subjective symptom determination will not be disturbed. *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).

Here, as noted above, the ALJ identified several medically determinable physical and mental impairments, thereby satisfying the first prong of the analysis. (Tr. 20-21). Turning to the second step, it is also clear that the ALJ evaluated the intensity, persistence, and functional limitations of those symptoms by considering objective medical evidence and other evidence. With regard to the seven ennumerated factors, the ALJ considered her activities of daily living when assessing the letters submitted by Pedelose's husband and neighbor addressing the assistance they provide her with her activities and Pedelose's testimony regarding the difficulty she has doing dishes and assisting her daughter with her homework. (Tr. 26-27). Additionally, the ALJ addressed the location, duration, frequency and intensity of Pedelose's pain and other symptoms thoroughly throughout the decision, specifically considering the swelling in her feet, and the back pain she experienced when elevating her feet to relieve the swelling (Tr. 25-27, 29, 34), her heart issues, and the impact that condition had on the swelling in her feet (Tr. 25, 27, 29, 35), the impact her lower extremity swelling had on her blood pressure and its subsequent impact on her ability to stand and balance (Tr. 25, 28), pain and limited range of motion and strength she experienced throughout every day as a result of her back and right knee degeneration and her

fibromyalgia diagnosis (Tr. 26, 30-36), and her morbid obesity and asthma that affected her breathing (Tr. 27-30, 32-33, 35-36). The ALJ considered precipitating and aggravating factors impacting her pain and swelling, including her obesity and her heart condition. (*Id.*).

The ALJ also considered the treatments Pedelose received, both medicinal and otherwise, and the effectiveness and side effects of those treatments. The ALJ noted that Pedelose testified to taking Tramadol to treat her back pain and fibromyalgia. (Tr. 25). The ALJ also wrote that she was treating with hypertensive medications at the time of her onset date, and was prescribed Bumex to treat symptoms of fluid retention and edema. (Tr. 27). Pedelose noted her breathing, fatigue, and edema all improved once she started taking the Bumex. (Tr. 28). Pedelose's cardiologist also noted that it appeared her swelling may have been caused by Pedelose's blood pressure medication, nifedipine, but Pedelose chose to continue the medication. (Tr. 29). In May 2023, Pedelose was also taking Lasix to help reduce the swelling. (Tr. 30). The ALJ noted that Pedelose found little benefit from chiropractic care for her knee and back. (*Id.*). She began attending pain management in June, 2022, and was treating with Tramadol, acetometaphin, and a muscle relaxer. (Tr. 31). The ALJ also noted treatment of Pedelose's back with radiofrequency ablation procedures and medial branch blocks, which produced 90% relief on her right lumbar, and 70% on her left. (*Id.*). When offered physical therapy in October 2022, Pedelose declined. (*Id.*).

In summary, the ALJ clearly followed the guidance of Social Security Ruling 16-3p when evaluating Pedelose's subjective complaints. The ALJ is not required to address all seven of the enumerated factors when applying the second prong of the test, the ALJ applied at least five quite thoroughly in his determination of Pedelose's RFC. Accordingly, this issue, like the others above, does not countenance remand.

## VII.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Pedelose's applications for DIB and SSI be affirmed.

Dated: December 18, 2025

Reuben J. Sheperd
United States Magistrate Judge

_____

### OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\*\*\*

Failure to file objection within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendations. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard*

*v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991) Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act." *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, 2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interests of justice. *See United States v. Wandashega,* 924 F.3d 868, 878-79 (6th Cir. 2019)